H. H. INGERSOLL et al. *v.* COAL CREEK COAL COMPANY et al.

(*Knoxville.*    September Term, 1906.)

1. **ATTORNEY AND CLIENT.** One defendant participating in codefendant's compromise of plaintiff's claim is equally liable for compensation of plaintiff's attorneys, when.

Where individuals sued jointly with a corporation as the chief defendant, after notice of the plaintiff's employment of certain attorneys to prosecute the suit, participated in, and really brought about, a compromise, settlement, and payment of plaintiff's claim by the defendant corporation, without the consent of said attorneys, such individuals are individually and personally liable to the same extent as the corporation for the compensation of such attorneys. (*Post, pp.* 302, 303.)

2. **SAME.** Same. Defendants sought to be held liable for compensation of plaintiff's attorneys may rely upon invalidity of contract of employment, when.

In a suit instituted by the attorneys of a plaintiff seeking to recover from the defendants their compensation on the ground that said defendants compromised with such plaintiff directly, without their consent and after notice of their employment, such defendants are not precluded from setting up as a defense that the contracts of employment of said attorneys were obtained in such a manner and under such circumstances as renders said contracts invalid and unenforceable. (*Post, p.* 303.

3. **SAME.** Same. Same. Solicitation of suit debars the attorney of right to compensation from the defendant compromising with his client without his consent, when.

Where attorneys, through the personal solicitation of their special partner or representative, procure a contract of employment to prosecute a suit in the manner and under the circumstances

stated in the opinion of the court, they are guilty of such acts of impropriety, so inconsistent with the character of the profession and incompatible with the faithful discharge of its duties, that a court will not entertain a suit by such attorneys to recover compensation for their services from the defendant who had compromised the suit with their client without their consent after notice of their employment, though no infidelity to the interests of their client was imputed to said attorneys. (*Post, pp.* 303-314.)

Code cited and construed: Secs. 5781, 5783 (S.); secs. 4745, 4747 (M. & V.); secs. 3970, 3972 (T. & S. and 1858).

Acts cited and construed: 1817, ch. 51, sec. 1; 1821, ch. 66, sec. 3.

Cases cited and approved: Bank v. Hornberger, 4 Cold., 531; People v. MacCabe (Colo. Sup.), 32 Pac., 280, 19 L. R. A., 231; 13 Am. St. Rep., 270; People v. Brown (Colo. Sup.), 30 Pac., 338; People v. Goodrich, 79 Ill., 148..

4. **SAME. Same. Same. Same. The courts and the public are concerned in the conduct of attorneys at law.**

In the case stated in the last headnote above, it is not the client alone who is concerned, but the court and the public, and the issue is not whether the client has been injured, but whether the conduct of the attorney has been contrary to the character of the profession and opposed to a sound public policy and to a proper and decorous administration of the law. The legal profession must not be lowered to that of a mere business in which fleetness of foot or the celerity of the automobile determines who shall be employed. (*Post, pp.* 311, 313.)

FROM ANDERSON.

Appeal from the Chancery Court of Anderson County. —HUGH G. KYLE, Chancellor.

INGERSOLL & PEYTON, for Ingersoll et al.

H. B. LINDSAY, CHARLES T. CATES, JR., and R. E. L. MOUNTCASTLE, for defendants.

---

MR. JUSTICE WILKES delivered the opinion of the Court.

The facts found by the court of chancery appeals are set out in its opinion as follows:

"The dominant facts appearing in the record, proper to be stated, raising the question or proposition involved in this assignment of error, are these:

"Messrs. Ingersoll & Peyton are a law firm resident of and having offices at Knoxville, Tennessee. They are practitioners in the courts of this State. Complainant Chandler is a much younger member of the Knoxville bar.

"Some seven years ago he entered into a contract with the firm of Ingersoll & Peyton, under the terms of which he was to have one-third of the fees accruing from the business he brought to the firm; he assisting in looking up the evidence and preparing such cases for trial as he obtained, or as came to the firm through him.

"In brief, we take it from the evidence, while not a full partner in the firm, he was a partner in it with reference to such business as he procured for it.

"We infer from the record that he had his office quarters with the firm.

"We see nothing immoral, unprofessional, or obnoxious to public policy or a correct standard of professional ethics in such a partnership relation. Such a relationship in the practice of law has existed from time immemorial in the profession in this State between lawyers of the highest honor and the keenest sense of the dignity of the profession.

"In short, there is nothing wrong *per se* in such an arrangement between honorable members of the profession.

"The methods that may be adopted or resorted to to procure legal business present another question.

"Now, when the Fraterville mine explosion occurred in 1902, young Chandler a few days thereafter conferred with Mr. Peyton, of the firm of Ingersoll & Peyton, and betook himself to Coal Creek, in Anderson county, where the explosion occurred, and actively solicited parties having rights of action against the defendant company, or supposed to have such right of action against it, growing out of the deaths or injuries caused by the explosion, to intrust the prosecution of their cases against the company to the firm of Ingersoll & Peyton, representing to such parties that the firm of Ingersoll & Peyton was composed of able lawyers entirely competent to protect and secure their rights in the courts.

"It appears that when he reached the field of prospective litigation he found other lawyers there ahead of him, who were engaged in soliciting suits for deaths and injuries caused by the explosion.

Ingersoll v. Coal Co.

"He entered actively into the competition for business.

"It does not appear, however, that he practiced any fraud or deception, or made any false representations, to get cases for his firm. He boldly and openly saw widows and others whose husbands and next of kin had been killed in the explosion, and sought, as other lawyers were doing, to have them intrust the bringing and prosecution of suits against the company to his firm.

"He made several trips to Coal Creek for the purpose of soliciting business for the firm, his expenses being paid by it.

"He secured some forty cases for the firm, and it appears from the record that one hundred and fifty or more other cases were brought by other lawyers against the company in the courts, all in a few months after the explosion.

"Chandler secured written contracts from the parties he procured to intrust their cases to his firm, and these contracts stipulated the fees the firm was to charge; it being a specified per centum of the recovery obtained in each case.

"He reported the cases he procured to the firm, and the firm brought suits in the circuit court of Knox county, except one, brought in Anderson, for damages in each against the defendants; the amount of damages in the writs usually being for $10,000.

"The firm prepared and filed declarations in all the

cases specified in the bill, and made investigations and prepared to try them.

"The firm were attorneys of record in the cases, and the defendants were notified of the fact that they were attorneys of record in the cases.

"Young Chandler, it appears, was not acquainted with the parties at Coal Creek, whose cases he procured for his firm, and met them there for the first time. Indeed, so far as shown by the record, he was a stranger to the community at Coal Creek until he went there on this business.

"It appears that Judge Ingersoll, of the firm of Ingersoll & Peyton, was not aware of the first visits of young Chandler to Coal Creek on this business, and was not consulted with reference to his going there on the business before he went.

"We infer and find, however, that he was aware of some of his visits there for the purpose of securing cases. Indeed, he does not intimate in the record any objection to the course pursued by the young man in the matter, and, in argument before us, insists that it in no sense violates the law, however objectionable it may be to the professional taste of some members of the profession.

"It is only necessary to state further, to present the question raised by this assignment of error, that defendants, after complainants had taken the steps in their cases herein stated, conceived the purpose of compromising the damage suits against them, and commenced

negotiations for a settlement, by paying the plaintiffs in each case the sum of $320.

"Messrs. Ingersoll & Peyton, it seems, declined to urge or advise their clients to accept this compromise, and thereupon the defendants, with respect to most of the cases mentioned in the bill, through their general counsel, employed other counsel or agents to negotiate a settlement ignoring complainants.

"These are the essential facts appearing in the record, necessary to be stated in disposing of the assignment of error under review."

The court of chancery appeals then proceeds to state the question involved, as it appeared to them, and to give their conclusions as follows:

"The question, under the facts thus stated, in its legal essence, is:

"If a lawyer accept cases and institute suit on them, which he knows were procured by open, personal solicitation of another lawyer from strangers to both, no fraud or misrepresentation appearing in the solicitation, the lawyer instituting the suits agreeing to pay the soliciting lawyer one-third of the fees legitimately chargeable in the cases, is he guilty of a violation of public policy and of his oath as an attorney under our statute, and hence, under the law, debarred the right to recover his fees, no infidelity to the interest of his clients being imputed to him?

"The question with respect to the underlying princi-

ple involved may be more briefly stated in another form:

"Is it a violation of the public policy of this State, and a contravention of the oath of a lawyer under our statute, for the lawyer to personally and openly solicit legal business from strangers to him?

"Our statute (Shannon's Code, section 5781) provides that the 'several courts of this State may strike from their rolls any person not authorized to practice in such courts, and also any practicing attorney or counsel upon evidence, satisfactory to the court, that he has been guilty of such misdemeanor or acts of immorality or impropriety as are inconsistent with the character or or incompatible with the faithful discharge of the duties of the profession.'

"As a matter of general law, statutes of this character are not restrictive of the general powers of the court over attorneys practicing before it.

"Attorneys at law are officers of the court, and the court may exercise its jurisdiction over them, depriving them of their office and striking their names from the rolls.

"This power and jurisdiction are indispensable to protect the court, to attain the orderly administration of justice, to uphold the purity and dignity of the profession, and promote the public welfare and secure the interests of clients. It is a power inherent in the court itself, and exists independent of statutes, although statutes may regulate its exercise. *Ex parte Steinman,* 40

Am. Rep., 637; *People* v. *Green* (Colo. Sup.), 3 Pac., 65, 374, 49 Am. Rep., 351.; *In re Henderson*, 88 Tenn., 531, 13 S. W., 413.

"Is the personal solicitation of business by a lawyer from strangers, the personal request to strangers that they intrust the bringing and prosecution of such suits as they may desire to bring to enforce their rights, an act of immorality, or an act of impropriety, inconsistent with the character or the duties of the profession?

"There is nothing immoral *per se* in the solicitation, unless the inherent nature and quasi official character of the labor involved in the pursuit of the profession in courts in the trial of cases make it so.

"Lawyers, as men, are as other men, and men in all other pursuits and professions solicit business.

"Merchants seek business by personal solicitation, and through paid agents seek it.

"Hotelkeepers strive for it by runners to meet trains, newspapers ask for it by paid solicitors, and officeholders go for it and labor with much sweat to keep it.

"And even preachers some time seek charges.

"But while lawyers, as men, are as men of other pursuits, and, generally speaking, no better and no worse, nevertheless, in the prosecution of their profession, they are differentiated from all other professions and callings.

"In the first place, they cannot practice their profession without a license.

"In the second place, they are required to possess a

good moral character and certain legal attainments. In attending to legal business, especially in cases intrusted to them, they act as officers of the law and the courts, and in an important sense represent the public, in that it is their duty to aid in administering justice and preserving the integrity of the governmental agencies of the State, thus securing the confidence of the people in the honesty of their purpose, and aid to conserve the end for which they are established.

"We have found no decision of any court and no textbook authority holding that the personal solicitation by a lawyer to strangers to employ him to bring and prosecute such suits as the strangers may have the right to have instituted constitutes a violation of the lawyer's oath of office, or is such an act of impropriety as authorizes his disbarment under statutes similar to ours.

"It will not do to say that all solicitation of business by a lawyer brings him under the condemnation of the statute or renders him obnoxious to a correct standard of professional ethics.

"Most lawyers 'hang out their shingles.'

"Many lawyers insert their professional cards in the newspapers, telling where they can be found and the courts they practice in and the character of business they are particularly fitted to look after. Proper advertisements and solicitations, addressed to the general public, are frequently resorted to by members of the highest standing in the profession.

"While different and varying standards of profes-

Ingersoll v. Coal Co.

sional ethics relating to the matter are honestly entertained by different members of the profession, it is believed that the better standard, maintained by those accepted as representative of the true spirit and nobler end of the profession, is that personal and special solicitations of particular persons, and especially strangers, to become clients, are unprofessional.

"The basic idea on which this standard must rest, it seems to us, is that an attorney, being an officer of the court in which he practices, and obligated by his oath to aid in eliciting the truth and administering justice in cases tried therein with which he is connected, by such personal solicitation, resulting in a suit intrusted to him, becomes a party to the suit in such sense that his fidelity to his client and to his personal interest in the result may lead him to ignore or forget the fidelity due from him to the court and the ascertainment of the truth, and the consequent enforcement of justice. But, whatever may be the standard with respect to this matter by different members of the profession, it is urged by appellants that our supreme court, in an order made on its own motion on an attorney to show cause why he should not be disbarred, has set the standard for this State.

"We are referred to the case of *In re C. W. Lester,* and the order made therein by the supreme court at its recent session at this place.

"Its order in said cause is as follows:

117 Tenn—18

Ingersoll v. Coal Co.

" 'At the present term of the court there has been presented a record in the case of Annie Gibson against the Southern Railway Company, involving an intervening petition filed in said cause by attorneys at law, in which they set out the fact that they were employed as attorneys to prosecute a suit in favor of Annie Gibson against the Southern Railway to recover damages for the alleged negligent killing of the husband of said Annie Gibson by that railway company.

" 'In this petition it is alleged that they had instituted suit on this claim in the circuit court of Knox county, in which pleadings had been made up; that a trial was ultimately had, in which there was a verdict in favor of Annie Gibson against the Southern Railway Company for $4,000; but that on motion for a new trial, for reasons satisfactory to the judge of that court, this verdict was set aside, and a new trial was given.

" 'The petition further alleges that great labor was bestowed in the preparation of this cause by the attorneys, who were satisfied that their client was entitled to a recovery after the granting of a new trial; that they made themselves ready once more for a new trial of the case, which was prevented by a compromise had at the instance of the Southern Railway Company with their client personally, and without the consent of her attorney, for the sum of $600.

" 'Petitioners, in their said pleadings, alleging that under the statute made and provided therefor, they were entitled to a lien for their professional services upon the

cause of action, asked a reference to ascertain the value of their services, and, upon this being done, that they might have judgment against the railway for the amount so ascertained.

" 'There was an answer to this petition filed by the Southern Railway Company, after which a reference was made, and upon this reference proof was taken.

" 'Among the witnesses examined was one of these petitioners, C. W. Lester, and also the plaintiff in the suit of Annie Gibson.

" 'The deposition of Lester shows that through one Cunningham, a friend of Annie Gibson, he solicited employment in this case, being at that time an entire stranger to Mrs. Gibson, and that this recommendation for employment was made by Cunningham through a letter addressed to Mrs. Gibson, who was then residing in Johnson City, in this State.

" 'When the deposition of Mrs. Gibson was filed, certain letters, signed with the name of C. W. Lester and addressed to Mrs. Gibson at Johnson City, in one of which, to wit, of date August 11, 1905, following up the letter to Cunningham, he indirectly solicited employment in that case for himself and another attorney at the Knoxville bar.

" 'Among other letters so filed is the following:

" ' "Knoxville, Tenn., Oct. 1904.

" ' "Mrs. Annie Gibson, Johnson City, Tenn. —Dear Madam: We write you a few lines to-day. I am am able to set up in bed. Guess you heard of me being

in the terrible railway wreck near Newmarket some days
ago. It will more than likely be fifteen or twenty days
before the case is reached. Maybe by that time you will
have the money to come to Knoxville. I hope you will.
We must try at this term of the court. It occurred to me
that you might know some of the Johnson City people
who were in the wreck and could influence them to turn
their business over to Hon. S. G. Heiskell and myself.
If you succeed in doing this, we will pay you $25 and $50
in each case. You must keep this to yourself. I think
surely you or your friends might manage a part of them.
You can tell them this is the place to bring suit. I am
in possession of facts no other attorney knows of. I
have written Mr. and Mrs. J. H. Schroll, 405 W. Market
street, of Johnson City. I referred them to you, and that
you could tell them about Mr. Heiskell and myself.

" ' "Thanking you for what may be done in our be-
half, I am, yours truly, C. W. Lester."

" 'It appearing on the face of the record that the con-
duct of said Lester in these respects was a breach of his
duty as a lawyer and citizen, the court of its own motion
makes a rule upon him to show cause why he should not
be stricken from the roll of attorneys on this court.
This rule is returnable on Friday morning, December 1,
1905.'

"The insistence of appellants is that the supreme
court in the above order, made of its own motion, estab-
lished the rule in this State that a lawyer who solicits
the suit of a stranger through an acquaintance, who is a

Ingersoll v. Coal Co.

friend or acquaintance of the party supposed to have the right of action, or who solicits a party to get suits for him, promising to pay for this service, in either case commits a breach of his duty as a lawyer, contravenes the public policy of the State, and subjects himself to disbarment and to the deprivation of the right to collect his fees in cases thus secured.

"So far as we are advised, the supreme court has not finally acted in the case of Mr. Lester, still having it under advisement.     It has delivered no opinion, written or oral, so far as we are aware, touching this matter.

"It is quite true that its order in the latter case, in its terms, is plainly susceptible of the construction that in its opinion, tentatively expressed, so to speak, in an order in the nature of an interlocutory order, or conditional order, a lawyer who solicits the suit of a stranger, through an acquaintance who is a friend of the stranger supposed to have the right to bring suit, or who solicits a party to get suits for him, promising to pay for such services, violates his duty as a lawyer and citizen, and subjects himself to disbarment, either under our statute or the common law.

"If the supreme court shall hold in its final opinion in the *Lester Case* the rule prescribing the standard of professional conduct as contended for by appellants, we will follow and indorse it in all cases coming before us in which the facts present a case calling for such action on our part.

"But having found, after diligent search through all

the reports and text authorities accessible to us, no case nor text authority that makes such solicitation of business by a lawyer a ground for disbarment or for depriving him of his fees (no fraud, deception, misrepresentation, nor infidelity to the rights of clients so obtained being imputed to him), under our statute or similar statutes in other States, we are unwilling, until the supreme court so establishes the rule by an opinion thus construing our statute, or announces it as a principle of the common law, or until the legislature establishes it, to adopt and enforce it in this case, whatever may be our opinion as to the impropriety or reprehensibility of such solicitation on the part of a lawyer. As before stated, we think the correct standard of professional ethics on the part of the profession relative to this matter, illustrated by its best exemplars, does not sanction such solicitation.

"But, as we understand our function as a court, it is not our duty or province to decide this case and the rights of these complainants, with respect to the subject under review, by a rule or standard fixed or upheld by the ethics of the profession of law as advocated and followed by the highest and most eminent members of the profession, nor the lowest, nor all, the members, but by the law, either as established in the body of the common law as adopted in this State, or as enacted by the legislature.

"To construe our standard herein quoted (Shannon's Code, section 5781) as subjecting an attorney to disbarment who solicits parties, in person or through another,

Ingersoll v. Coal Co.

having suits in court, to prosecute or defend them, pushed to its logical end, would or might be far-reaching in effect and operation.

"It is common knowledge that some of the most eminent lawyers in the State have requested in person, as well as solicited, men of prominence and judges of our courts, intermediate and final, to recommend their appointment and employment by corporations and other large concerns as their regular attorneys to attend to all their legal business, or all their suits arising in a certain territory, and it is reasonably certain that they were employed as the result of such solicitation, indorsements, and recommendations.

"We have never heard it suggested that an attorney thus soliciting business and getting it rendered himself obnoxious to the statute and subject to disbarment.

"If a large business in its operation causing or originating successive suits can be solicited by a lawyer in person or through another *en bloc,* a separate fee being charged in each case, we see no reason, in the principle of the thing, why he cannot thus solicit employment in the cases separately considered.

"An honorable lawyer will deport himself with the same dignity and regard for professional propriety in the one instance as in the other.

"The writer has no hesitancy in saying that he has but little, if any, regard or respect for the professional ethics of what is called in the slang of the day 'the ambulance chasers' in the profession.

"But, so far as we are advised, not even the Bar Association of the State has established or pronounced a rule condemning the method of getting business resorted to by the 'ambulance contingent.'

"It has, we believe, taken the position that it is highly unprofessional for one lawyer, to use the language of the late Judge Guild, deceased, to 'gouge in' and try to take the case of another lawyer out of his hands.

"But, so far as we have been able to find authorities dealing with statutes similar to ours above quoted, the 'misdemeanors' or 'acts of immorality' or 'impropriety' coming under their condemnation and calling for the disbarment of the lawyer guilty of them are such acts on the part of the lawyer as emanate from an immoral character, or show that he is unworthy of public confidence and unfit to be intrusted with the conduct of cases in the courts. *In re Henderson*, 88 Tenn., 531, 13 S. W., 413; *Serfass' Case*, 116 Pa., 455, 9 Atl., 674; *People* v. *Appleton*, 44 Am. Rep., 812; *In re Wall*, 13 Fed., 814; s. c. 107 U. S., 265, 2 Sup. Ct., 569, 27 L. Ed., 552; *Baker* v. *Com.*, 10 Bush (Ky.), 592; *Dicken's Case* (Pa.), 5 Am. Rep., 420.

"These statutes have, so far as we can find in the books, no relevancy to, and are not directed at, the mere methods the lawyer may resort to to secure his employment in cases that parties have the right to bring in the court, where no fraud or deception is practiced to get the cases.

"It is to be regretted, perhaps, that the legislature has

not enacted a statute covering the case of the 'ambulance chasers,' as they are sometimes called in the profession; but until it does, and until it pronounces in legislation a condemnation of the personal solicitation of business by a lawyer, or his solicitation of business through another, or until the supreme court in a final opinion establishes the rule that condemns such solicitation and makes it a ground for disbarment, we are unwilling to establish it under a construction of our statute, or as embodied in the common law enforced in this State, basing such construction on our conception of the code of professional ethics that should control members of the profession.

"Complainants are not repellable from court under the facts of this case on the grounds of champerty, maintenance, or barratry.

"Our statute now permits the contracting for a contingent fee by a lawyer, and it is believed that our supreme court has, in view of our legislation, announced that the doctrine of maintenance, as a punishable offense, does not prevail in this State.

"But, if it does, as the offense is defined by the common law, these complainants were not, under the facts, guilty of the offense.

"Maintenance, as generally defined, is an officious intermeddling in a suit by one that has no connection with it, by maintaining or assisting either party with money or otherwise to prosecute or defend it. 4 Black. Com.,

149; *Perine* v. *Dunn*, 3 Johns. Ch. (N. Y.), 508; *Bristol* v. *Dann* (N. Y.), 27 Am. Dec., 122.

"Maintenance is somewhat akin to barratry, which, under the common law, is the offense of frequently exciting or stirring up suits and quarrels, either at law or otherwise.

"Lord Coke defines a common 'barrator' as 'a common mover or exciter or maintainer of suits, quarrels, of parties either in courts or elsewhere in the country. In courts, as in courts of record, or not of record, as in the county, one hundred or other inferior courts in the country in three manners: First, in the disturbance of the peace; second, in taking and keeping possession of lands in controversy, not only by force, but also by subtlety and deceit, and most commonly by suppression of truth and right; thirdly, by false inventions and sowing of calumniations, rumors, and reports, whereby discord and disquiet may grow between neighbors.' Coke, Litt., 368.

"Generally by statute, common barratry is the practice of exciting groundless judicial proceedings.

"It is a common law offense and misdemeanor, punishable by fine and imprisonment at the discretion of the court, and, when an attorney is the offender, by his disbarment.

"The conduct of complainants, as disclosed by the record, simply amounted to the solicitation of parties to intrust the prosecution of their suits, or supposed rights of action, to them as their lawyers.

"If complainants are amenable to the rule invoked by appellants, under which they are charged with violating their oaths as attorneys under our statute, appellants can make the question in this case.

"Parties coming into a court of equity seeking affirmative relief must come, as the books have it, with 'clean hands'; otherwise they will be repelled.

"The 'uncleanness of hands' charged here is that they solicited strangers to intrust the bringing and prosecution of suits the strangers thought they had the right to bring to them.

"We have diposed of this charge so far as it affects the right of complainants to charge their legitimate fees in the cases referred to in the pleadings.

"We do not think there is any substantial merit in the other assignments of error of appellants, except their second error assigned.

"The fee mentioned in said second error assigned should be $111.36, instead of $121.36, as appears in the decree of the chancellor.

"We infer this error occurred in calculation, as $111.-36 is in accord with the basis fixed and the holding of the chancellor.

"This assignment of error is sustained to the extent indicated.

"All other errors assigned are overruled.

"The Messrs. Camp, who were defendants to the various suits mentioned, having participated in their compromise, settlement, and their dismissal without the

consent of complainants as attorneys of record in the cases against them, will not be heard to deny their liability for the reasonable fees of complainants up to the amount they advised and participated in the payment of as a compromise thereof.

"This disposes of all the questions in the case. The decree of the chancellor will be affirmed, with costs."

We have set out this finding, in order to state the entire and exact facts which we are called upon to consider and pass upon.

We state the contentions of the complainants. It is insisted for them, in the language of H. H. Ingersoll, their attorney:

"(1) Freedom of contract is a personal liberty and a property right, guaranteed by both State and federal constitutions, as well as an inherent right guaranteed by the Declaration in 'the pursuit of happiness.' *People* v. *Williams* (N. Y. Ct. App.), 79 N. E.—, on the factory labor act.

"(2) Lawyers employ this right and liberty in the same measure and to the same extent as other citizens, they may contract in the same mode and manner as others, and their contracts are valid unless contrary to law. *Newman* v. *Washington,* Mart. & Y., 81; Weeks' Attorneys at Law, section 185.

"(3) The summary jurisdiction of courts over contracts of lawyers in their fiduciary relation to clients is exercised for the protection of the clients, and does not extend to a lawful contract of retainer, wherein the

parties deal at arms' length, and the fiduciary relation does not exist. Weeks' Attorneys at Law, section 364.

"(4)   The validity of a contract of retainer, in whatsoever form and howsoever affected, whether sought by client or lawyer, is determined by the same rules of law as other contracts; and, having the mutual assent of the parties, it withstands impeachment unless unlawful—*i. e.,* (1) contrary to positive law; (2) contrary to positive morality; (3) contrary to public policy.

"Impropriety is not ground for nullifying a contract. *Newman* v. *Washington,* Mart. & Y., 81; Wald's Pollock on Contracts, 243.

"(5)   There is no public policy in Tennessee forbidding lawyers to solicit business.  No statute directly or indirectly denounces it.  On the contrary, all Tennessee legislation relating to the subject for the last twenty years has liberalized lawyers' contracts, and encouraged contracts theretofore considered of doubtful propriety.

"All lawyers seeking for business directly or indirectly solicit it.  The common law permits solicitation by attorneys.  Green Bag, October, 1906; 1 Tidd's Pr., 60.

"Complainants sued, as attorneys of record of ten plaintiffs, whose suits had been compromised and dismissed, to recover of defendant the amount due them as fees from said plaintiffs for which they had statutory liens upon the causes of action of the compromised cases.  Defendants' answer was full of denials and groundless assertions made by way of defense.  Complainants proved all their allegations.  Defendants

proved only two of their assertions, to wit: (1) That complainant Chandler solicited the cases, and (2) brought them to Ingersoll & Peyton to institute and prosecute for said plaintiffs on a division of fees, which defendant insist was 'illegal and altogether improper,' and therefore prayed that the suit be dismissed. The chancellor overruled this defense and gave decree for complainants. Defendants appealed and repeated their contention before the court of chancery appeals, which expressly declined to make any ruling upon the 'altogether improper' phase of the litigation, on the ground that the court was not *censor morum,* nor *arbiter elegantarium,* but merely *judex litium,* in which character it took jurisdiction of the legality of the contract, and decided that, inasmuch as it knew of no law invalidating a lawyer's contract merely because he proposed it, and defendant had produced none to that effect, the decree of the chancellor must be affirmed.

"Defendants, still being dissatisfied, have again appealed, and renew their said contest in this court, assigning for error (1) that in no event should decree be rendered against Camp & Son, as they were only officers of the codefendant company; (2) that complainants' relation as attorneys was the result of their own solicitation, and therefore the contracts for fees were illegal and void, and improper; and the bill should have been dismissed because complainants' hands were unclean, and they deserve disbarment, from which counsel graciously excuses them!

Ingersoll v. Coal Co.

"A glimpse of the defendants' orthodox views on legal ethics and professional proprieties may be had from the finding that, when complainants declined to urge their clients to accede to defendants' proposed terms of compromise, defendants then employed other lawyers for plaintiffs in said actions, who would accept the terms.

"For full statement of these facts made by the principal defendant, see complainants' brief before the court of chancery appeals, showing that complainants' refusal to betray their clients necessitated this suit.

"Since defendants now graciously remit disbarment, a subject not in this case, 'aut allegatis aut probatis,' complainants will be excused from following defendants into the alluring field of ethics, and be allowed in this brief merely to discuss the two assignments of error made upon the matters at issue in the suit.

"(1)  *Nonliability of Defendants Camp.*

"The finding of fact on this point is that they participated in the compromise and dismissal of suits to which they were defendants and are therefore liable for complainants' fees.

"Defendants in their brief assert the facts to be otherwise, and feebly argue on their own assertions their nonliability for fees.

"Complainants rely upon the statute law, apparently ignored by defendants, that the finding of fact by the court of chancery appeals is conclusive even upon them, and there is, therefore, no escape from the conclusion of

that court that defendants participating in the compromise and payment of the plaintiffs' demands are liable under the statute for the fees of their attorneys of record.

### "(2)   Illegality of Demand.

"To this assignment, appellees have two replies:

"(1)   This objection is not open to appellants.

"They are strangers to these contracts; and, if the parties thereto are content, strangers cannot object to them.   The general doctrine is that the objection of illegality of contract is personal, and can be made only by parties and their privies.   *Cleveland* v. *Miller*, 94 Mich., 97, 53 N. W., 961; *Williams* v. *Simpson*, 70 Miss., 113, 11 South., 689; *Wood* v. *Erie R. Co.*, 72 N. Y., 196, 28 Am. Rep., 125; *Ohio Life Ins. Co.* v. *Merchants' Ins. Co.*, 11 Humph. (Tenn.), 53 Am. Dec., 742, as to incidental illegality.   Also *Jones* v. *Davidson*, 2 Sneed, 447.

"These contracts are not void, and only parties could avoid them.   This rule is applied in Tennessee, even in cases of usury, where public policy is involved.   *Parker* v. *Bethel Hotel Co.*, 96 Tenn., 252, 34 S. W., 209, 31 L. R. A., 706; *Nance* v. *Gregory*, 6 Lea, 345-351, 40 Am. Rep., 41.

"If these contracts, instead of being fair and valid, had been fraudulent, still defendants could not have pleaded that fraud; such defense being personal to the debtors.   *Smith* v. *Greaves*, 15 Lea, 468.

"*A fortiori*, they cannot make such defense where the

contracts are free from fraud or illegality, and impropriety is the only defense.

"(2)   The contracts were not illegal.

"The court of chancery appeals find and report that there was no fraud, deception, or false representations connected with them, nor any champerty, maintenance, or barratry.

"No statute is cited which has been violated. Illegality is charged solely upon the fact that Chandler, an attorney at law, solicited the cases, and thus obtained retainers by the plaintiffs in the actions at law for the counselors, Ingersoll & Peyton, who faithfully demeaned themselves therein according to the best of their skill and ability.

"This legal question, then, is sharply presented: Is a contract of retainer illegal merely because it is solicited?

"It is admitted by appellants' counsel that no statute forbids lawyers to solicit business, and that no text-writer states this to be the law; but they insist it must be the law because, forsooth, no one ever said it was not the law!

"The cases of *Langdon* v. *Conlin* (Neb.), 93 N. W., 389, 60 L. R. A., 429, 108 Am. St. Rep., 643, and *Alpers* v. *Hunt* (Cal.), 24 Pac., 846, 9 L. R. A., 483, 21 Am. St. Rep., 17, cited as controlling authority for defendants, are not even analogous to this one. They were both actions brought by laymen against lawyers to enforce

117 Tenn—19

contracts for division of fees in cases brought to the lawyers by the laymen, instead of an action by lawyers to enforce a statutory lien for their fees. The decisions in both cases remove them even farther from this one, for they are expressly based upon statutes of Nebraska and Colorado, forbidding the acts on which the laymen based their suits!

"*Maires' Case* likewise arose under a special statute of Pennsylvania against barratry in hiring laymen to bring cases to attorneys. Similar statutes exist in New York and other States, under which attorneys have been disbarred; but no layman, or act of layman, is involved in this case. Chandler, though not exercising the functions of a barrister, was a licensed attorney and solicitor, and was protected by the ancient law permitting solicitation, and practiced in England to this day. Green Bag, October, 1906.

"Defendants being thus without any book of law, statute, decision, or text-book, on which to rest their plea of illegality, ask the court to declare these contracts illegal because solicitation of employment by lawyers is obnoxious to public policy; and yet they cite no statute, no rule of ethics, nor common-law authority to show such public policy. Not a word, or hint, even, is found in the Code sections cited to sustain the proposition that solicitation is illegal. Indeed, it cannot be affirmed that the legislature, in enacting these sections, had in mind any contract establishing the relation of attorney

Ingersoll v. Coal Co.

and client.   They relate rather to the misconduct of the attorney in that relation.

"The 'good cause' loosely mentioned in section 5783 must, of course, refer to statutory cause, or some common-law cause, then recognized as sufficient.

"But solicitation was not only not a cause for disbarment at the common law, but was recognized as a commendation for admission to the bar.   1 Tidd's Pr., 60.

"The 'clean hands' invoked by a far cry to excuse defendants from the payment of their lawful debts can have no application, unless complainants' contracts with their clients have defrauded defendants.   Snell's Equity, pp. 38-39; 1 Pomeroy Eq. Jur., sec. 400.

"Here the very contrary is the fact:   Complainants are expressly acquitted of any fraud, while defendants, by their device of employing another attorney to act for complainants' clients in the matter of the compromise, and refusing to pay complainants' statutory fees, themselves show dirty hands!

"Defendants' insistence that their view of the law must be correct, since their counsel can find no case to the contrary, is sustained by Thomas Gray in the memorable words, 'Where ignorance is bliss, 'tis folly to be wise,' and will warrant the coining of a new legal maxim, not found in Broom, or any other author, but appropriate to defendants', contention:   'The law is always with you, if you find nothing to the contrary!'

"The record of the *Lester* or *Gibson Case* shows a barratrous correspondence of such flagrance as to move

the court *sua sponte* to make a rule on counsel to show cause against disbarment. If there were anything in this case to suggest such a rule, that case might be a precedent; but, lacking entirely the virus which inoculated it, this case is immune from censure.

"The decision of the chancellor and the court of chancery appeals rests on firm foundations: 'Complainants' contracts were legal and fairly made. They cannot be indirectly impeached or annulled for mere impropriety. They must be obnoxious to some law—some rule of conduct prescribed by competent authority and existing at the date of contract. We can find none, and have been shown none, which they contravene. We must, therefore, hold them lawful, and it is decreed accordingly.'

"The plain question is whether a frank, open, direct request for a retainer invalidates the contract of employment made thereupon to bring and conduct a lawsuit. All lawyers seek employment in some manner. They may do it through friends, or cards, or advertisement, or local puffs, or recommendation of other lawyers, or of judges, or in numberless conceivable methods, generally indirect; but, all the same, they solicit cases and fees.

"Confessedly, all these methods are lawful, and the contracts made thereon are valid. Uusally the client comes to the lawyer. But, suppose the lawyer goes to the client and solicits his business, and it is given to him by the corporation or firm or person by annual retainer; would such a contract be invalid? No man will say it.

Ingersoll v. Coal Co.

"In principle what difference is there, if the lawyer seeks a single case only, instead of a general retainer? or asks for the fee directly, rather than indirectly? Does the law reward or approve indirectness, and censure frank directness? What element of a valid contract is present in the former and absent in the latter?

"This legal contention is not a question of etiquette, but of law.

"Chandler's method of direct approach and solicitation is not in general favor with the bar, and would repel many clients. But some lawyers and some clients like that method and pursue it. Are their contracts, freely, fairly, and understandingly made, without compulsion or constraint, undue advantage or fraud, unlawful? Is there any mandate of the law to the lawyer: 'Thou shalt not solicit cases?' If so, it is unlawful, but not otherwise. There is no statute to this effect, nor any rule of court. 'Law is a rule of civil conduct prescribed by the supreme power,' says Blackstone. It can never properly be a law, unless notified to those who are to obey it. It was not found in the common law, either in text-books or decisions. On the contrary, attorneys and solicitors were expected to solicit business, just like other persons, and did it through the centuries, and do it now. Green Bag, October, 1906.

"Barristers did not, perhaps, because that was not good form at the Inns of Court; nor could they sue for their fees. But the rules of the Inns of Court do not apply to the American lawyer. Like the English solic-

itor or attorney, he may solicit and sue for his fees;
for he performs the very services which they did.   He
is not only a professional man, like the barrister; he
is also a business man, like the attorney or solicitor; and
he has the rights of both.   *Newman* v. *Washington,*
Mart. & Y., 81.

"Public policy is said to forbid soliciting fees, and to
invalidate a contract for fee, if the proposition is made
by lawyer and accepted by client, rather than *vice versa;*
and to sustain this contention sections of the Code are
cited, which not only do not forbid it, but do not even
in the most remote way refer to it.

"It is begging the question to say that it is a profes-
sional impropricty to solicit a fee.   It assumes that there
are other than legal standards for determining pro-
fessional propriety, and that impropriety amounts to
illegality, whereas there is in Tennessee no standard but
a legal one for testing legal rights; and the censure of
the bar, even a resolution of the State Bar Association,
denouncing solicitation, would not nullify a contract ob-
tained in that way.   Legal rights do not depend on bar
resolutions.   The legislature might invalidate such con-
tracts by statute; possibly the judiciary might make a
rule having that effect; but surely, until the legislature
has so enacted, or the courts have promulgated such a
general rule, contracts valid at the common law may not
be nullified by them because one lawyer, or a hundred
lawyers, or even a court, should think this method of ob-
taining practice improper, as beneath high professional

standards.   Such a law would not retroact, for that would impair the obligation of a contract; *a fortiori*, such a rule of court could not.

"The 'other good cause' in Code, sec. 5783, can mean nothing more than lawful cause, and cannot be stretched so as to embrace the private or professional views of any number of gentlemen, however reputable; for this is a court of law, and this a government of law, and not of men or of functionaries.   This phrase 'other good cause,' for whatever purpose considered, then, must be limited to statutory or common-law causes.   It would include barratry, champerty, embracery, forgery, false pretenses, and other criminal acts affecting contracts, and such other acts as the courts of common law had declared illegal and were recognized as in force in America.   Surely it could not go beyond these.

"Now, what acts were so regarded are set forth in detail in 1 Bacon's Abr., 421, *et seq.*, and in the long roster of offenses or misbehavior of attorneys, including all manner of unprofessional conduct, such an offense as soliciting cases is not mentioned.   Therein are denounced fraud and corruption, unauthorized appearance, using another attorney's name, practicing without license, protracting suits, making unnecessary costs, claiming fees for work not done, refusing to deliver papers or pay over money of clients to them, taking out *capias* when there was no original, forging a writ or otherwise imposing upon the court, colluding to bring a groundless suit or support a frivolous complaint, and

other like acts showing infidelity or dishonesty; but no intimation is there of solicitation being unlawful or ground for disbarment.

"So, likewise, in 1 Comyn's Digest, 760, under 'what things an attorney ought not to do,' in a whole page list of forbidden things, such as, to practice deceit or beguile the court, to bring a collusive suit or plead a false plea, to raze a record or forge a writ, to practice champerty or extortion, to be an ambidexter or to withhold a writ on the day appointed for trial, and many other like things, not a hint is given that he may not solicit cases; but (page 767) he had the privilege to sue for his fee, which a counsel had not.

"Nor does Blackstone, our great tutor of the common law, hint at any such disqualification. Nor in the forty pages on 'Attorneys' in Tidd's Practice, p. 60, *et seq.,* is there any allusion to it. So, also, in America, our standard writers, Kent and Weeks (on Attorneys), and even Sharswood's Ethics, make no mention of such a rule. And in those great modern monuments of professional research and publishers' enterprise—Am. & Eng. Ency. of Law and Cyc.—purporting to give an abstract of the law from all American cases and reference to them, wherein scores of pages are devoted in text and notes to attorneys, not a case is mentioned wherein an attorney has been disbarred, or his contract for fees annulled, for soliciting a cause, unless in so doing he had been guilty of champerty or barratry, or had violated some statute of the State; and yet therein are cited scores of cases

Ingersoll v. Coal Co.

for all sorts of professional peccadilloes, which is a *sine qua non* of professional offense. In Cyc. particularly, the grounds are set forth methodically under eight separate heads—'Bad Character,' 'Conviction of Crime,' 'Fraud in Procuring Admission,' 'Fraud Toward Clients,' 'Improper Treatment of Court,' 'Misuse of Records,' 'Nonprofessional Conduct,' and 'Professional Misconduct'—and scores of cases are cited under each head, showing more than one hundred causes of disbarment; but nothing in any of them suggests solicitation of causes as illegal or improper in an attorney.

"In the eight hundred pages given by Mr. Weeks to Attorneys at Law, treating his subject historically and analytically, there is no statement that either in England or America it was ever ruled that it was unlawful, or even improper, for an attorney of any kind to solicit employment, directly or indirectly. *Per contra,* after alluding to the old rule requiring a power of attorney from the client to warrant the appearance of the attorney in his cause (185) and its entire abolition in America, so as to allow retainer by parol, he states the present law to be: 'The contract of retainer may be made, like any other. It may be express or implied.'

"After this trust relation is established, then all dealings between them are subject to the strictest surveillance, and the *onus* of showing perfect fairness is upon the attorney; but the retainer, whereby the relation is established, is, both as to form and substance, tried by

the general rules of contract law. *Newman* v. *Washington*, Mart. & Y., 81.

"This is but saying that all an attorney's dealings are subject to the general rules of law, controlling the contracts of other persons; the retainer by the general contract law, applying to all classes of persons entering the contract relation, and all later dealings by the rule of *'uberrima fides,'* controll.'.g all trustees and fiduciaries.

"And in a republic, wher· equal protection of the law is guaranteed, and the sam·· rules of action, by constitution and institution, are applied to all persons, without regard to class, how could it be otherwise? Either law, promoting justice, or discretion, which is the rule of tyrants, is the sovereign power over us; and it would be a strange comedy of life if lawyers could not claim the protection of the law. Indeed, the general trend of opinion, professional, judicial, and lay, is that, being ministers of the law, they are most of all men its subjects. Whatsoever is unlawful they may not do with impunity. If they violate the law they are subject to its punishment. And, correlatively, whatsoever, is permitted to others is also allowed to them, as citizens. The benefits as well as the penalties of the law are theirs, equally with other citizens, whether in the domain of law or equity, in torts or in contracts. Whatsoever contracts others may make, so may they; howsoever other *in consimili casu* may make contracts, so may they. In their contracts with strangers, they deal at arms' length; with

clients, they must beware of the trust relation and its obligations.  Such is the American law, and there is no precedent to the contrary.  Lawyers and judges have searched the year books, the hornbooks, the reports, and the text-books, treatises and commentaries, digests, and cyclopedia, sedulously, eagerly, for an opposite case; but all in vain!

"There is abundant authority for annulling contracts, conceived in fraud or obtained by unlawful means, but not a single utterance to the effect that a contract fairly made, and not made in violation of any statute or rule of the common law, is void, merely because one or the other party thereto proposed or solicited it.  Defendants' contention is unwarranted either in principle or authority, and, to come to the truth of it, seems to be a studied effort to introduce a new element into the law of contracts—a special rule for lawyers' retainers, not applicable to any other class of citizens:  'Woe to the lawyer who seeks retainers; if you invite or solicit causes, your name is—Denis, and your case is—Mud!

"Such an abnormal graft upon the tree of justice would warm the cockles in the bosom of directors and officers of the accident insurance companies, all the railway companies, street and commercial, and all other companies maintaining an organized force of expert compromisers, who with automobile outfit compete with 'ambulance chasers' for the first interview with the wounded, and who are generally successful, as being better prepared for the emergencies of the business.  Only

give them this rule, that a solicited fee is void, and their monopoly of business is established, competition is banished, rivals are crushed, the trust rule is enthroned. Thereafter, with their regular physician to assure the victim in all the confidence of learning and friendship that his injury is slight and temporary, the law agent may obtain the accord and satisfaction receipt for a trifle; and a long step is taken in the road that exempts them from justice!

"'Able papers' have been read before the bar associations by distinguished general counsel to induce professional denunciation of the practice, and petition for legislative action; but in vain. Nor does it matter what any bar association may have resolved. They have not even the power of Inns of Court to recall from the bar any whom they may have called to it. They cannot fix public policy; that function is governmental; and the legislature of Tennessee, instead of limiting the liberty of attorneys, has enlarged them by repeal of the champerty laws, the increase of pauper rights, and the extension of lien from judgment to cause of action, thereby indicating plainly a public policy contrary to that asserted by appellants.

"It is mere cant and hypocrisy for attorneys to denounce the solicitation of cases. Those who have business have sought it, some by advertising, some by recommendation, some by pipe-lining, some by indirect request, and some by direct solicitation. Shall all be disbarred? Shall all sought retainers be nullified? If not, then

where shall the line be drawn? Shall it be the line of propriety? If so, who shall draw the line? The majority of the profession, or its best members? And who shall elect the best? And by whomsoever drawn, how shall it be done? Such lines befit a *'court d'honneur;'* but obviously no such standards of judgment as to legal right can obtain in a court of law. The legal standard is the only one for deciding legal rights of lawyers or other suitors. And the sole question in this case, as in all others, is what is the law?

"This standard defendants and other parties have often invoked in this court; and none other is tolerable! It was employed in the *Gibson Case,* when Lester's fee was disallowed, not merely because he solicited a fee, but because the evidence in the case disclosed barratrous solicitation toward the railway company generally as to the Newmarket wreck, in which Gibson was injured, so plainly as to show the Gibson contract barratrous, and therefore unlawful, so much so as to require the court *sua sponte* to exercise its summary jurisdiction, and require Lester to answer as to his unlawful conduct. So, also, in this case, would the court, notwithstanding appellants' pretentious pardon, make the same rule, if there were evidence of improper professional conduct in making a barratrous or otherwise unlawful contract. But here the entire freedom of the retainers sued on from fraud or illegality of any kind is expressly adjudged by the court of chancery appeals, and nothing is here to invite or suggest such action against complain-

ants, whatever may be the court's opinion of appellant Camp's performance with Cross; and they are immune, not by virtue of defendants' pardon, but from their decreed innocence of wrong, having merely exercised their inherent liberty of lawful contract. For this reason, the *Gibson Case* is not a precedent for this as to the matter involved in it—the contracts for retainer. The contract of Lester was illegal, while those obtained by Chandler were lawful contracts, and therefore inviolable on mere notions of propriety, however high their origin or confident their champion.

"Complainants' suit upon these contracts is a legal demand made in the chancery court, and triable by rules of law, and by no other standard; and no authority being found for impeaching these contracts, no law annulling them, the decrees of the chancellor and the court of chancery appeals should be affirmed.

"P. S. If the woman proposes, and lawful marriage ensues, will her proposal make the issue bastards?

"H. H. INGERSOLL,

"Counsel for Complainants."

Before proceeding to dispose of the main question argued, we think it only necessary to say that we are of opinion that, if the coal company is liable in this action, so are the defendants Camp individually, for the reasons set forth in the opinion of the court of chancery appeals —that they participated in, and really brought about, the compromise and payment of the plaintiff's demands,

Ingersoll v. Coal Co.

and were sued by the plaintiffs jointly with the coal company.

It is said that the objections raised to the complainants' demands are not open to the appellants, because they are strangers to the contract. We think this assignment not well made. If the contracts made are void, then these parties can avoid them, because upon the contracts must be based the liability of the defendants to a money decree. There may be a question, or questions, involved in the case personal only to the complainants, and with which the defendants are not concerned, but they are concerned so far as the facts constitute a ground of recovery against them.

It is insisted that the contracts made are not illegal. This, we think, does not reach the root of the case, as the contracts themselves, abstractly considered, may be legal, and yet there may be circumstances surrounding their making which would deter the courts from enforcing them, or rights based on them, when all the facts are divulged and the nature of the consideration appears.

Appellees state the legal question thus: "Is a contract of retainer illegal merely because it is solicited?" Evidently the question in this case is not so broad as this statement, but should be limited to such solicitation and facts as appear in this case.

We have no express statute defining what an attorney may or may not do in the prosecution and practice of his profession. The code of ethics which the general assembly has prescribed can be gathered largely from

the statutes which lay down causes for disbarment. Section 5781, Shannon's Code, prescribes: "The several courts of this State may strike from their rolls any person not authorized to practice in such courts, and also any practicing attorney or counsel upon evidence satisfactory to the court that he has been guilty of such misdemeanor or acts of immorality or impropriety as are inconsistent with the character or incompatible with the faithful discharge of the duties of his profession."

Personal solicitation of a suit is not specifically mentioned as one of the grounds of disbarment; but it is evident that the legislature did not intend to limit the power of disbarment to the causes specifically mentioned, but an attorney may be disbarred for any good cause. Shannon's Code, sec. 5783.

The legislature well knew that it could not particularize every ground for disbarment, and it also well knew that attorneys were officers of the court, and that courts have the inherent power to keep their forums pure by removing therefrom all parties appearing therein whose practices and acts tend to make them impure, or to impede, obstruct, and prevent the administration of the law, or destroy the confidence of the people in such administration. Our statute was passed in 1817, and amended in 1821. Acts 1817, c. 51, sec. 1; Acts 1821, c. 66, sec. 3.

To the honor of the profession, but few occasions have arisen for its enforcement, and still less for its proper construction. The language of the act is very broad,

and places the profession of the law upon a high and honorable plane; and it has been the effort of the bar, and, so far as lay in its power, the bench, to observe and maintain that high and honorable *status.*

In the leading case of *Bank* v. *Hornberger,* reported in 4 Cold., 531, this court, through Special Judge E. H. East, one of the ablest lawyers that ever adorned the bar or bench of Tennessee, said, when speaking of the relation of attorney and client: "This brings us to the consideration of the relation of attorney and client, and in this we have derived great aid from English decisions, as well as those of our own courts; and a review of these decisions shows most conclusively that the relation is one of great delicacy, extremely fiduciary in its character, and he who has strictly guarded against committing any breach of it in the course of a long practice has continually cultivated the highest virtues of his nature." Pages 566, 567.

And again: "An attorney is a man set apart by the law to expound to all persons who seek him the laws of the land, relating to high interests of property, liberty, and life. To this end he is licensed, and permitted to charge for his services. The relation he bears to his client implies the highest trust and confidence. The client lays bare to his attorney his very nature and heart, and leans and relies upon him for support and protection in the saddest hours of his life. Knowing not which way to go to attain his rights, he puts himself

117 Tenn—20

under the guidance of his attorney, and confides that he will lead him aright."

This was spoken in a case in which dealings between attorney and client were involved; and the case is not cited, because in its facts it is entirely in point and similar to the present case, but to show the estimation in which an attorney is held and regarded by this court, and with what concern and care the conduct of attorneys is watched over by it.

We refer to only a few of the many cases in which the courts have been called upon to give expression to their views as to what constitutes unprofessional conduct.

In *People* v. *MacCabe* (Colo. Sup.), 32 Pac., 280, 19 L. R. A., 231, 36 Am. St. Rep., 270, the court, speaking through Elliott, J., said: "The ethics of the legal profession forbid that an attorney should advertise his talents or his skill, as a shopkeeper advertises his wares. An attorney may properly accept a retainer for the prosecution or defense of an action for divorce, when convinced that a client has a good cause; but for any one to invite or encourage such litigation is reprehensible. . . ."

In *People* v. *Brown* (Colo. Sup.), 30 Pac., 338, cited in 19 L. R. A., 231, the court said: "When this court grants a license to a person to practice law, the public, and every individual coming in contact with the licensee in his professional capacity, have a right to expect that

Ingersoll v. Coal Co.

he will demean himself with scrupulous propriety, as one commissioned to a high and honorable office."

In the case of *People* v. *Goodrich,* 79 Ill., 148, referred to and approved in *People* v. *MacCabe,* supra, the court, speaking through Mr. Justice Breese, said: "This court, having power by express law to grant a license to practice law, had an inherent right to see that the license is not abused or perverted to a use not contemplated in the grant. In granting the license it was on the implied understanding that the party receiving it should, at all times, demean himself in a proper manner; and if not reflecting honor on the court appointing him, by his professional conduct, he would at least abstain from such practices as could not fail to bring discredit upon himself and the courts. . . . An honorable high-toned lawyer will always aid a deserving party seeking a divorce, as coming strictly within his professional duties. He will render the aid, not solicit the case; and he will, in all things regarding it, act the man, and respect, not only his own professional reputation, but the character of the courts, and discharge the unpleasant duty in all respects as an honorable attorney and counselor should do."

An attorney or counsel may be disbarred, if he has been guilty of an act of immorality or impropriety inconsistent with the character or incompatible with the faithful discharge of the duties of his profession, or any other good cause.

In the beginning it may be well to note that counsel,

as well as attorneys, are liable to this rule; and the distinction which obtained between attorneys, counsel, and barristers, under the English or common law, does not prevail in Tennessee, at least as to the right to compensation for services; and our institutions and form of government do not tolerate or recognize the distinctions under the English government.

The other matter which we desire to call attention to is that attorneys and counsel are by the statute denominated "professional," and not "business," men. The courts have never laid down any specifications of what constitutes an immorality or impropriety inconsistent with the character or incompatible with the faithful discharge of the duties of the legal profession. It is probable that such an attempt will never be made, since it would be impracticable to cover all cases that may arise in any enumeration that may be made.

We come, then, to the direct question whether the facts and conduct of complainants in this case bring them under the ban of the statute, or in violation of any proper rule of action in the court which would call upon the court to deny them relief for their fees.

It is evident that there may be many cases of immorality and impropriety on the part of attorney or counsel which would constrain the court to deny them relief for fees, which might not be considered sufficient to disbar the attorney or counsel from practice. We need not enlarge upon this, as it is too plain for question. Now, the present case is simply this. There had been a ter-

Ingersoll v. Coal Co.

rible disaster in the defendant's mine, caused by an ex-
plosion, and hundreds of men had been suddenly killed,
and numbers of women made widows, or childless, and
numbers of children made fatherless.  It was such a ter-
rible catastrophe as to shock the community and arouse
universal regret and horror.  We may grant that a right
of action accrued to the next of kin of every person killed
and to every person injured.

The complainants, through their special partner,
Chandler, went at once to the scene of the disaster, and
personally solicited such parties as had rights of action
to put their claims into complainants' hands.  Under the
facts, the firm, and each member, was a party to this
personal solicitation.

It seems that other attorneys reached the scene of
disaster before the complainants; and, as the court of
chancery appeals state, Chandler "entered actively into
the competition for business, that he boldly and openly
saw widows and others whose husbands and next of kin
had been killed in the explosion, and sought, as other
lawyers were doing, to have them intrust the bringing
and prosecution of suits to his firm, but that it does not
appear that he practiced any fraud or deception, or
made any false representations to get cases for his firm.
He made several trips to Coal Creek on this business,
at the expense of the firm.  He secured some forty cases,
and one hundred and fifty or more cases were secured
by other lawyers, all in a few days.  The cases were to
be prosecuted on a contingent fee of so much per cent.,

and of this Chandler was to have a certain proportion. Suits were brought, and compromised afterwards, as has already been set out. There can be no doubt of plaintiff's right to recover, unless they are denied relief on the ground of unprofessional conduct which the court deems sufficient to repel them."

We are of opinion that, under the facts disclosed by the finding of the court of chancery appeals, complainants are not entitled to recover, because these facts show acts of impropriety inconsistent with the character of the profession and incompatible with the faithful discharge of its duties.

We cannot agree to several propositions advanced by complainants. We cannot agree that in these latter years a spirit of commercialism has lowered the standard of the legal profession. We cannot agree that the practice of law has become a "business," instead of a "profession," and that it is now allowable to resort to the practices and devices of business men to bring in business by personal solicitations, under the facts shown in this case.

As to how far an attorney may go in soliciting business, or whether he may solicit at all, we are not called upon to decide; but when such a case is presented, as is disclosed in this record, of attorneys rushing to the scene of disaster in hot haste, and competing with each other in soliciting the bereaved ones to allow them to sue for their losses, we feel that we are called upon to say in no uncertain terms that such conduct is an act of impro-

priety and inconsistent with the character of the profession. We cannot, we dare not, lower the standard of the legal profession to that of a mere business, in which fleetness of foot, or the celerity of the automobile, determines who shall be employed.

The miserable victims of the disaster are dazed by the terrible bereavement. They are in no condition to consider their rights to damages. In their extremity, they fly to any one promising relief, when, if left to time and more mature consideration, they would be enabled to make, perhaps, a better choice. In addition, it is unbecoming a member of the profession, and a public scandal, and when he bases his right to recover fees upon such improper conduct, and lowering the character of the profession and the court, it is no excuse that other attorneys do the same; but this is rather a reason why this court should act promptly and decidedly, in order that an end may be put to the practice.

It is no excuse that corporations which have caused such disasters have been alert to send their agents and representatives to the scene, with a view of forestalling suits and making favorable compromises. This court has never failed to condemn this practice in the strongest terms; and, whenever a case has come before it which in any way smacked of fraud or undue advantage arising out of such conduct, this court has not been slow to disregard or set aside improper or hard settlements. But such agents of corporations are not, as a rule, officers of the court, nor do they occupy that high *status* which the

law places the attorney upon; and we think that we can safely say that if any attorney should make such settlement, under such circumstances, this court would not hesitate to disbar him.

It is said that there is no precedent for refusing fees because of such conduct. If this be so, we are admonished by the record in this case that it is high time that such a precedent be set, and in such terms as may not be mistaken or misunderstood.

The argument made in this case, that such practice is not looked upon with disfavor by many members of the profession, that it is freely indulged in by prominent attorneys, that it is necessary to successful practice, and that the court of appeals, while deprecating the practice, does not condemn it—these and other arguments call for a full and emphatic expression from this court in this case.

It is said that, even if this rule should prevail in considering questions of good faith and professional conduct between attorney and client, after the relation is established, it does not prevail in the making of the contract of employment, and that in making such contract, before the fiduciary relation has become established, the parties stand upon the same footing and as strangers to each other.

There is unquestionably a difference between the relations existing between attorney and client before and after employment, and in some respects, at the time and in the matter of a retainer of the lawyer's services, so

Ingersoll v. Coal Co.

that an attorney, after he is employed, will not be allowed to charge fees which he might have charged, when he was retained, if the same are excessive (*Rose* v. *Mynatt,* 7 Yerg., 30; *Phillips* v. *Overton,* 4 Hayw., 291), but this principle does not reach the present controversy.

Here it is not the client alone who is concerned, but the court and the public; and the question is not narrowed down to the issue whether the client has been injured, but whether the conduct of the attorney has been contrary to the character of the profession, and opposed to a sound public policy and to the proper and decorous administration of the law.

As a matter of fact, the present suit does not concern these clients specially. They will not be benefited or burdened by it. They are interested in it in the same sense that the general public is interested, and not by their individual relation to it.

We are not now attempting to lay down the rule of good faith between lawyer and client, but the professional conduct of the attorney as he appears to the court and public in the practice of his profession. Nor are we attempting to lay down a rule of conduct for the agents of corporations in their efforts to effect compromises of damage suits. When a case, such as counsel depicts, arises, we will deal with it as we think the law and public policy demand.

Reference was made in the arguments and briefs of counsel to the record in the case of Lester. The facts in that case are not, upon the questions at issue, materi-

ally different from the case at bar, and the principles of law are the same. In that case Lester and his associates were denied fees, and as to that feature of the case there has been a finality in the decree of this court. The case is still pending upon the court's motion to disbar him.

But there are two distinct features in the *Lester Case* —one to deny him fees, as in the present case; and the other to disbar him. In the present case, no disbarment proceedings have been brought, and we are not called upon to pass upon that question. In the *Lester Case,* the defendant pleads in extenuation of his action his youth and inexperience, and the example of older and more prominent members of the profession, as well as his impaired physical condition; and these are matters which address themselves to the consideration of the court in proceedings for disbarment, but they are not matters which would move the court to allow the collection of fees by the party in fault.

For the reasons stated, we are of opinion that the complainants are not entitled to recover, and the decree of the court of chancery appeals is reversed, and complainants' suit dismissed; and they will pay all costs.