MALLIE M. ROSS v. ERASTUS GOSSETT et al.

Eastern Section.   October 31, 1926.

Certiorari denied by Supreme Court, February 12, 1926.

1. **Principal and agent.**  An implied agency is distinguished from an agency by estoppel although the two are usually confused and courts as a rule do not attempt to make any distinction.

An implied agency is an actual agency, and is a fact to be proved by deductions or inferences from other facts, while in a strict sense agency by estoppel should be restricted to cases in which the authority is not real but apparent.  Agency by estoppel can be invoked only when the third party knew and relied on the conduct of the principal, while in cases of true implied agency he need have had no knowledge of the principal's act, nor have relied upon the same; the agent by implied authority being an actual agent, the principal is liable for his acts the same as though the authority had been expressed.

2. **Bills and notes.**  Payment of negotiable instrument to one not in possession of the instrument and who is not expressly authorized to receive the same for the holder as his agent, does not satisfy the instrument.

Where the maker of a negotiable instrument pays it before maturity to one not in possession of the instrument he must at his peril determine that the party to whom he pays it is a duly authorized agent of the holder and if he is not such an agent the instrument is not satisfied.

3. **Bills and notes.**  Maker of a note secured by deed of trust is entitled to have property sold before he is personally liable.

In an action to recover on promissory note secured by deed of trust where the maker of the note had sold the property and the purchaser was supposed to take up the note but paid the money to a party who was not authorized to receive it, and later suit was brought on the note, held that the maker of the note was entitled to have the property sold first, before there could be a recovery from him personally.

4. **Usury.**  The usurious statute is for the protection of the person borrowing money and is personal to himself and his privies.

In an action to recover for promissory notes where the maker of the notes had sold the property securing the same to his co-defendant, and the co-defendant had attempted to pay the notes but had paid the money to the wrong party, held that he was not a privy of the maker and was not entitled to the benefit of the usurious statute.

5. **Costs.**  Where party has failed to list negotiable instrument sued on for taxes he is liable for the costs in a suit to collect the same.

Where the record showed that the complainant had failed to list for taxes the notes sued on, held that complainant should pay all costs of the cause and a lien declared on the recovery for the taxes.

Appeal from Chancery Court, Knox County; Hon. Chas. Hayes Brown, Chancellor.

Affirmed.

H. G. Fowler, of Knoxville, for Mallie M. Ross.

J. Alvin Johnson, W. K. Anderson and L. C. Ely, all of Knoxville, for appellee.

PORTRUM, J. The bill in this case was filed by Mallie M. Ross to collect three promissory notes for $2600, accrued interest and attorney's fees, which were secured by a deed of trust on certain real estate located in Knox county. Erastus Gossett and wife were the makers of the notes, and at the date of their execution were the owners of the real estate covered by the trust deed. The notes were executed on the 17th of April, 1919, due twelve months from date, consisted of two $1,000 notes and one $600 note, all payable to S. R. Rambo, at the Union National Bank of Knoxville. On October the 18th, following, Gossett and wife conveyed the premises covered by the trust deed to the defendant John W. Kidd, for the purchase price of $3400, the deed reciting the purchase money was paid in full, to the parties of the first part, but as a matter of fact John W. Kidd retained sufficient of the purchase money to discharge the Ross notes with interest and undertook to see to the application of the purchase money in payment of said notes. To carry out this purpose his attorney, who had examined and reported upon the title to the property, took the money to the office of Rambo, for the purpose of paying and taking up the notes, when Rambo, or his representative, stated that Mr. Gossett requested that the notes be sent him and declined to turn over, or at least did not turn over, the notes, giving the aforesaid reason, but his real reason was he did not own the notes nor have them in his possession. Gossett's attorney, accepting the statements of Rambo for their face value, proceeded to turn over funds sufficient to discharge the principal and interest to Rambo and at a time when the notes were not matured.

Some little time after the execution of the aforesaid notes Miss Ross applied to Rambo to purchase securities and she was offered the Gossett notes. She had her brother investigate the security and the title to the real estate covered by the trust deed, which he reported satisfactory, when she purchased the three notes paying the sum of $2600, or their face value, the notes were properly endorsed by S. R. Rambo, and what she believed to be the original deed of trust, together with the notes, were turned over to her. At the expiration of six months, which was an interest bearing period, the interest was paid to her by Rambo, or through his office, and the interest every six months thereafter was promptly paid by Rambo and the complainant remained in total ignorance of the payment to Rambo of the principal by Kidd's attorney until after the failure of S. R. Rambo and of Rambo & Company, when his deception was exposed, and then the defendant learned also that they had been duped by the false representation of Rambo and by paying over the funds without demanding and requiring a surrender of the negotiable papers which were then not due.

At the time Kidd's attorney attempted to pay the notes he required that Rambo release the trust deed securing them upon the record, and one W. L. Jack, who was the trustee and also an agent of Rambo, undertook to sign a release upon the margin of the record as the owner of the notes, but the release is signed by Jack, not as agent of Rambo nor as trustee under the trust deed, but in his individual capacity, and at the time he was not the true owner of the notes individually nor was his principal, Rambo, a true owner and his release was therefore ineffectual, and Kidd was in no way misled by the purported release, having taken Rambo's or Jack's statement that Rambo was the owner of the notes with authority to make the release without requiring the production of the notes, by these parties who professed to hold the notes in their possession.

Rambo, through a long period of years, was a security broker and money lender in the city of Knoxville, doing a large business, reputed to be wealthy and bearing a good reputation for honesty and fair dealing. He took advantage of his standing in the community, capitalized his reputation for honesty, appropriated the money of his customers, failed and has absconded. As a part of his business he loaned large sums of money to borrowers, taking trust deeds as security, and he would endorse and sell these securities to other customers in a ready market, because of his custom in guaranteeing the payment of the obligation and also the prompt payment of the interest at semi-annual periods, paying his customers interest in excess of the legal rate, which proved attractive and made his notes saleable, the customer looking to him for the prompt payment of the interest, as well as the principal sum.

After the failure and bankruptcy of S. R. Rambo and of Rambo & Company, the complainant instituted this suit for the purpose of obtaining a judgment for the obligation and enforcing its payment by the sale of the real estate covered by the trust deed securing the debt. The defendants, Gossett and wife and John W. Kidd, resisted this relief upon the theory that the notes had been discharged by the payment of Kidd to Rambo, for the reason that Rambo was in law the agent of the complainant Miss Ross for the collection of the same.

It is insisted that the relationship of principal and agent arises by implication of law because of the particular transaction between Miss Ross and Rambo. There is no attempt nor insistence that there was an express contract of agency between them, but the defense is based upon an implied agency. The defendants relied upon the following excerpts taken from the testimony of Miss Ross to establish the agency:

"Q. It is your custom to go down and deposit money with Mrs. Samuels and tell her to send you a note? A. Not Mrs. Samuels, Mrs. Doyle.

"Q. He invariably gave you his personal check for these notes, which you paid into his office? A. Rambo & Company, if you call that personal.

"Q. In other words, he would 'phone you that the party who owed these notes, or a note, had paid it to him? A. Yes sir, always.

"Q. And asked you to bring in your note and get your money? A. Yes sir.

"Q. And when you came in, you invariably got the check of S. R. Rambo, or S. R. Rambo & Company, for your note? A. Always.

"Q. And that situation continued for a number of years? A. Yes sir.

"Q. And during that time you never made any releases at the court house? A. Never."

This testimony was a part of the cross-examination and the transactions detailed were different transactions from the one in question. They can throw little light upon the actual relationship in reference to the present transaction, but the course of conduct detailed is in no way inconsistent with the course of conduct of a broker selling security to a patron bearing his personal guarantee or endorsement. To hold that a holder of a note endorsed by responsible and solvent parties cannot receive the principal or interest from the endorser without constituting the endorser his agent and becoming responsible for his transactions had with the maker would undermine and destroy the sound basis of negotiable paper and disrupt business, while the benefits to be derived by creating an agency by implication of law would be inconsequential, only protecting the makers against their own negligent acts and folly. A simple act of prudence in requiring the production and surrender of a note affords them all the protection a reasonable person should expect.

This is well illustrated by the facts of this case. The defendant Kidd testifies as follows:

"When Mr. Sanford (his attorney) turned the deed over to me I asked him about the notes and mortgage and he said that the notes had been paid and released of record, which would take care of us, and that he notified Mr. Rambo to turn these notes and mortgage over to Mr. Gossett, and he had notified Mr. Gossett to take those notes up and they told him that these papers were not ours, they were Mr. Gossett's papers."

Mr. Sanford, the attorney for Mr. Kidd and to whom the money had been entrusted to see to its proper application, testified as follows:

"I examined the records and found those two mortgages, which was a little surprising because my information was that the $2600 mortgage was all there was against it. I saw Rambo, and he explained that $2600 was all there was against it; that the two notes of $1000 and $300 had been consolidated with the $2600 mortgage, and that the notes had been destroyed. He immediately sent down to the court house and released all of the mortgages of record, including the $2600 mortgage. I accepted Rambo's statement that all the former notes had been destroyed, it being a transaction often done.

"Q. Did you then and there pay S. R. Rambo, or S. R. Rambo & Company, this $2600 with interest? A. I did.

"Q. Did you get the notes at that time? A. I did not. Rambo informed me that Mr. Gossett had requested him to turn over the notes to him, that Gossett had seen him and wanted the notes given back to him, and that Rambo had promised Gossett to do that. All this was reported to Gossett when I gave him what money was coming to him.

"Q. Did you or not, when you paid Rambo the money, see the notes?" A. I did not.

"Q. Why did you not cancel them? A. For the reasons I have heretofore stated. Rambo stated that Gossett had been to him, and asked that the notes be returned to him. I reported this to Gossett and then I made the settlement with him, and I likewise reported this to Mr. Kidd.

"Q. Did you write Mr. Kidd a letter about it. A. Yes, I handed it to him myself.

"Q. Have you a carbon copy of that letter? A. I have.

"Q. Are you willing to file the copy which you have as an exhibit to this deposition? A. I prefer not to do so.

"Q. Will you file a copy of that carbon copy with your deposition? A. I will think about it."

He never filed it. The explanation above detailed is not sufficient to justify the payment of the obligation without the surrender of the notes. Mr. Kidd is responsible for the acts of his attorney, and he is in no position to complain, if he must be the one to suffer of two innocent parties litigating in this suit.

From the foregoing statement it can hardly be insisted that an agency by estoppel is established, and as heretofore said we are of the opinion that an implied agency, raised by law from the

proven facts, does not exist. The two agencies are distinguished as follows:

"Implied agency does not include, and is, technically speaking, distinguishable from, agency by estoppel, although the two are usually confused and the courts as a rule do not attempt to make any distinction, but use the two terms synonymously.

"An implied agency is an actual agency and is a fact to be proved by deductions or inferences from other facts, while in a strict sense agency by estoppel should be restricted to cases in which the authority is not real but apparent. Agency by estoppel can be invoked only when the third party knew and relied on the conduct of the principal, while in cases of true implied agency he need have had no knowledge of the principal's act, nor have relied upon the same; the agent by implied authority being an actual agent, the principal is liable for his acts the same as though the authority had been expressed." 2 C. J., Agency, sec. 42.

But had there been an implied agency in fact, then under the recent holding of our Supreme Court, parties dealing with an agent are required to use some degree of caution for their self protection. They may rely upon the right of an agent to make collection of a promissory note only when that agent possesses the notes and makes the fact known to the debtor, unless the debtor can show the agent had special authority to receive the payment under the circumstances.

"We are of opinion that as a general rule the debtor is not justified in paying the principal debt to an agent of the holder who is not expressly authorized to receive it, unless the agent, at the time of payment, has in his possession the securities paid and makes the fact known to the debtor, and, if the person to whom payment is made is not in possession of the written securities, the burden is upon the debtor to show that the one to whom payment was made had special authority to receive payment, or that he has been represented by the creditor to have such authority. There can be no basis for the debt or relying upon the apparent or ostensible authority of an agent not in possession of the written securities to receive payment. The mere act of paying the principal debt to one not the holder of negotiable instruments, and not in possession of them, is such gross negligence upon the part of the debtor that it is difficult to conceive how he could rely upon an apparent or ostensible authority of such agent to receive the payment. Possession of the securities properly indorsed of itself, and in the absence of countervailing facts, clothes the agent with

apparent authority to receive payment from and deliver them to the debtor. And the absence of the securities in the hands of the alleged agent is such a powerful circumstance of want of authority, that one making payment to him cannot claim that he appeared to have authority to receive payment, when in fact he did not.

"Agency rests upon contract between the principal and the agent. This contract cannot be made to appear to a third party by the declarations of the agent only, nor can the principal be held bound by a course of conduct upon the part of the agent unknown to him. For the acts of his agent within his express authority, the principal is liable because the act of the agent is the act of the principal. For the acts of the agent within the scope of the authority which he holds the agent out as having, or knowingly permits him to assume, the principal is made responsible, because to permit him to dispute the authority of the agent in such case would be to enable him to commit a fraud upon innocent persons. The same principle of equity which forbids the principal to deny responsibility for the acts of his agent within the scope of his apparent authority requires that the party dealing with the alleged agent shall show that he was aware of the acts from which the apparent authority is deduced, that he acted in reliance upon them, and that he did not act negligently, but used reasonable means to ascertain whether the power was possessed by the agent, and that in good faith he belived the agent was especially authorized to do the thing." Griswold v. Davis, 125 Tenn., 229.

The appellant's first assignment of error which challenges the act of the chancellor in decreeing against the defendant because of the absence of agency is for the foregoing reasons overruled.

The second assignment of error reads:

"At least he should have decreed that the recovery must first be made off of Gossett and wife and then, if any deficit, resort be had to the property of John W. Kidd."

This assignment is not well taken for the reason that Gossett and wife turned over the purchase money to Kidd, or let Kidd retain the purchase money, to pay the Ross notes and discharge the lien, and it was Kidd's negligence in paying the money without obtaining the notes and thereby protecting Gossett. Kidd cannot hold Gossett responsible for his own wrong, and as an additional reason the contract provided that upon default of the payment of the notes the property was immediately subject to the satisfaction of the notes.

The third assignment of error reads: ·

"The learned chancellor erred at least in refusing to credit the amount of the recovery with the amount of usurious interest admittedly received by the complainant."

Kidd bought the property in question, agreeing to pay $3400 therefor, and undertook to discharge the complainant's debt with a part of the purchase money. Had he applied in person to the complainant, Miss Ross, to pay off her debt and interest, he would not have been in any position to ask her to remit the usurious interest, and thereby gain for himself a benefit. The fact that he negligently paid the money to Rambo does not affect the rights between Miss Ross and himself, and the purpose of the usurious statute is for the protection of the person borrowing the money under circumstances not leaving him free to protect his interest, and is personal to himself and his privies.

"The question presented on this aspect of the case is, whether the purchaser at an assignee's sale of property incumbered with a mortgage for a specified sum, of which all parties have notice by law, can afterwards file his bill, on the simple footing of a purchaser, to get clear of usury and the debt secured by the mortgage. . . .

"A majority of the court think he cannot.

"It is ingeniously argued that such a purchaser stands in the shoes of the assignee, who stands in the shoes of the bankrupt, therefore he has all the rights of the bankrupt in reference to the property.

"This is plausible, but is not sound and fairly the facts of the case. The bankrupt is the original contractor of the debt, and is relieved in a court of equity on the ground that, though he is equally participant in the violation of law, he is an oppressed debtor in vinculis in the power of the lender, and therefore, the principle on which relief rests is the protection of borrowers against oppressive exactions by lendors; Bensley v. Homier, 42 Wis., 635.

"But does the purchaser of property incumbered by a mortgage given to secure a debt tainted with usury, stand on the same ground? We take it that it is almost too clear for argument that he does not." Nance v. Greggory, 74 Tenn., p. 345.

This case is cited as authority in the two later cases of Parker v. Bethel Hotel Company, 96 Tenn., 269, and Ingersoll v. Coal Co., 117 Tenn., 288.

The fourth and last assignment of error reads: ·

"The learned chancellor should at least have taxed the complainant with all the costs of the cause."

This is based upon the fact that the complainant had not given in the notes for taxes, and it is conceded by the attorney for Miss

Ross that under authority of Ross v. Albert, 139 Tenn., 1, she is liable for the cost of the cause. It appears from the record that in 1924 Miss Ross was a resident of Knoxville, and that she had not given in these notes for taxes. Under this admission the court will assume that for that particular year the notes were properly taxable upon the tenth day of January, and a lien is declared in favor of the State upon the recovery to secure the payment of state, county and municipal taxes for the year 1924, the proof failing to show a liability for any other year.

The record further shows that the property will bring a substantial increase if sold on time, than if sold under the terms of the trust deed for cash in hand, and while the assignments of error make no complaint upon this head, this court will mould its decree upon the equities justifying it so as to require the party seeking equity to do equity, and the decree of sale will follow the usual form of the master's sale of property upon six and twelve months' time. A decree will be entered here affirming the decree of the chancellor, except as is above modified. The cost of the cause below and the cost of the appeal is taxed against the appellee, Mallie M. Ross.

Snodgrass and Thompson, JJ., concur.